## IN THE UNITED STATES DISTRICT COURT FOR THE

## WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No.  **CR-21-298-R** |
| | ) | |
| LUIS CARLOS MAURICIO-MORALES, | ) | |
| a/k/a Carlos Morales, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

ROBERT J. TROESTER
United States Attorney

ELIZABETH JOYNES
Assistant United States Attorney
Virginia Bar No. 94827
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8849 (Office)
(405) 553-8888 (Fax)
elizabeth.joynes@usdoj.gov

i

## TABLE OF CONTENTS

**Page(s)**

BACKGROUND …………………………………………………………1

ARGUMENT………………………………………………………………...2

I.   Rational Basis Review is the Appropriate Standard of Scrutiny
 to Apply to Mr. Mauricio-Morales's Challenge to Section 1326.……………………..2

II.     Even if the *Arlington Heights* Framework Applied to
Mr. Mauricio-Morales's Challenge, his Motion to Dismiss
Should be Denied. ………………………………………………………..6

a.     Mr. Mauricio-Morales Fails to Carry his Burden
Under *Arlington Heights*. ……………………………………………...6

b.     Even if Mr. Mauricio-Morales Could Satisfy his Burden
 Under *Arlington Heights*, the Evidence Shows That Congress
Would Have Enacted § 1326 Without a Discriminatory Motivation. ……………14

CONCLUSION………………………………………………………17

CERTIFICATE OF SERVICE …………………………………………...18

# TABLE OF AUTHORITIES

**Federal Cases**

*De Leon-Reynoso v. Ashcroft,*
   293 F.3d 633 (3d Cir. 2002) ......................................................................... 3

*Department of Homeland Security v. Regents of the University of California,*
   140 S. Ct. 1891 (2020).............................................................................. 4, 7

*FCC v. Beach Commc'ns, Inc.,*
   508 U.S. 307 (1993) ................................................................................... 5

*Fiallo v. Bell,*
   430 U.S. 787 (1977) ................................................................................... 2

*Fong v. United States,*
   149 U.S. 698 (1893) ................................................................................... 2

*Hampton v. Wong,*
   426 U.S. 88 (1976) ..................................................................................... 2

*Heller v. Doe,*
   509 U.S. 312 (1993) ................................................................................... 5

*Hernandez-Mancilla v. Holder,*
   633 F.3d 1182 (9th Cir. 2011) .................................................................... 3

*Lara-Ruiz v. INS,*
   241 F.3d 934 (7th Cir. 2001) ...................................................................... 3

*Lehnhausen v. Lake Shore Auto Parts Co.,*
   410 U.S. 356 (1973) ................................................................................... 5

*Mathews v. Diaz,*
   426 U.S. 67 (1976) ..................................................................................... 3

*McCleskey v. Kemp,*
   481 U.S. 279 (1987) ................................................................................ 8, 9

*Moore v. Ashcroft,*
   251 F.3d 919 (11th Cir. 2001) .................................................................... 3

*Oceanic Steam Navigation Co. Ltd. v. Stranahan,*
   214 U.S. 320 (1909) ................................................................................... 2

*Pena-Cabanillas v. United States*,
    394 F.2d 785 (9th Cir. 1968) .................................................................... 5

*Personnel Adm'r of Mass. v. Feeney*,
    442 U.S. 256 (1979) ............................................................................... 7

*Powers v. Harris*,
    379 F.3d 1208 (10th Cir. 2004) ............................................................... 5

*Rojas-Rojas v. INS*,
    235 F.3d 115 (2d Cir. 2000) .................................................................... 3

*Seegmiller v. LaVerkin City*,
    528 F.3d 762 (10th Cir. 2008) ................................................................. 5

*Soskin v. Reinertson*,
    353 F.3d 1242 (10th Cir. 2004) .......................................................... 3, 10

*United States v. Alamosa Cnty.*,
    306 F. Supp. 2d 1016 (D. Colo. 2004) ..................................................... 9

*United States v. Amador-Bonilla*,
    No. CR-21-187-C, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021) ...................... 3, 4, 8

*United States v. Carrillo-Lopez*,
    __ F. Supp. 3d __, 2021 WL 3667330 (D. Nev. Aug. 18, 2021) ............................ 3, 4

*United States v. Gracidas-Ulibarry*, 231 F.3d 1188 (9th Cir. 2000) (en banc) ................5

*United States v. Gutierrez-Barba*,
    No. CR-19-1224-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021) ................... 3

*United States v. Gutierrez-Gonzalez*,
    184 F.3d 1160 (10th Cir. 1999) ............................................................... 5

*United States v. Hernandez-Guerrero*,
    147 F.3d 1075 (9th Cir. 1998) ................................................................. 5

*United States. v. Machic-Xiap*,
    __ F. Supp. 3d __, 2021 WL 3362738 (D. Or. Aug. 3, 2021) ........................... 4, 13

*United States v. Morales-Roblero*,
    No. 3:19-mj-24442-AHG, 2020 WL 5517594 (S.D. Cal. Sept. 14, 2020) ..................... 7

*United States v. Novondo-Ceballos*,
   No. CR-21-383-RB, 2021 WL 3570229 (D.N.M. Aug. 12, 2021) ............................3, 6

*United States v. O'Brien*,
   391 U.S. 367 (1968) ...................................................................................... 10

*United States v. Palacios-Arias*,
   No. 3:20-cr-62-JAG (E.D. Va. Oct. 13, 2020) ……………………………………..3

*United States v. Rios-Montano*,
   No. 19-CR-2123-GPC, 2020 WL 7226441, at *1–2 (S.D. Cal. Dec. 8, 2020) ………..4

*United States v. Wence*,
   No. 3:20-cr-27, 2021 WL 2463567 (D.V.I. June 16, 2021) ............................4, 7, 12, 13

*Vigil v. City of Las Cruces*,
   119 F.3d 871 (10th Cir. 1997) .................................................................... 9

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
   429 U.S. 252 (1977) ..............................................................................passim

*Washington v. Davis*,
   426 U.S. 229 (1976) ...................................................................................... 7

*Wong Wing v. United States*,
   163 U.S. 228 (1896) ...................................................................................... 4

*Zadvydas v. Davis*,
   533 U.S. 678 (2001) ...................................................................................... 4

**Federal Statutes**

8 U.S.C. § 1326(a) ........................................................................................ 1

Pub. L. 70-1018 ............................................................................................ 7

Pub. L. 82-414 .............................................................................................. 8

Pub. L. 89-236 .............................................................................................. 14

Pub. L. 99-603 .............................................................................................. 15

Pub. L. 100-690 ............................................................................................ 16

Pub. L. 101-649 ............................................................................................ 16

v

Pub. L. 103-322 .................................................................................................. 16

Pub. L. 104-132 .................................................................................................. 15

Pub. L. 104-208 .................................................................................................. 16

**Other Authorities**

Agreement Between the United States of America and Mexico Representing the
   Temporary Migration of Mexican Agricultural Workers,
   56 Stat. 1759, 1942 WL 35711 (Aug. 4, 1942) ...................................................... 10, 11

## BACKGROUND

Luis Carlos Mauricio-Morales, a citizen of Mexico, has been removed from the United States on two occasions—in 2011 and 2015.  (Docs. 15, 18.)  He reentered the United States again without receiving the consent of the Attorney General or the Secretary of Homeland Security to apply for admission to the United States and was discovered on or about October 9, 2021, within the Western District of Oklahoma.  (Doc. 15.)  The grand jury returned an indictment, charging Mr. Mauricio-Morales with unlawfully reentering the United States, in violation of 8 U.S.C. § 1326(a), on November 2, 2021.  (*Id.*)  On December 1, 2021, Mr. Mauricio-Morales filed a motion to dismiss, alleging that § 1326 violates the equal protection component of the Fifth Amendment's Due Process Clause because it was enacted with a discriminatory purpose.  (Doc. 18.)

This Court should deny the motion for several reasons.  First, Section 1326 withstands rational basis scrutiny, which is the appropriate level of scrutiny for federal immigration legislation, because securing the border is a legitimate governmental purpose and imposing criminal penalties as a deterrent for those who repeatedly violate that law is rationally related to that purpose.

Second, even applying the framework of *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), Mr. Mauricio-Morales fails to show that racial discrimination against Latinos was a motivating purpose in enacting § 1326.  To the contrary, historical records show that Congress aimed to quell racial discrimination—not to further it.  Because Mr. Mauricio-Morales cannot satisfy his

burden of showing that racial discrimination was a motivating purpose of enacting § 1326, he is not entitled to relief under the *Arlington Heights* framework, even if it applies.

Finally, even if the burden shifted to the government, Congressional action since the Immigration and Nationality Act of 1952, among other evidence, shows that Congress would have enacted § 1326 without any allegedly racially discriminatory purpose.

## **ARGUMENT**

### I.      **Rational Basis Review is the Appropriate Standard of Scrutiny to Apply to Mr. Mauricio-Morales's Challenge to Section 1326.**

"At the outset, it is important to underscore the limited scope of judicial inquiry into immigration legislation." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977); *see Hampton v. Wong*, 426 U.S. 88, 101 n.21 (1976) ("The power over aliens is of a political character and therefore subject only to narrow judicial review."); *Fong v. United States*, 149 U.S. 698, 713 (1893) ("The power to exclude or to expel aliens . . . is vested in the political departments of the government, and is to be regulated by treaty or by act of congress, and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or statute, or is required by the paramount law of the constitution, to intervene."). "'[O]ver no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo*, 430 U.S. at 792 (quoting *Oceanic Steam Navigation Co. Ltd. v. Stranahan*, 214 U.S. 320, 339 (1909)) (collecting cases).

Mr. Mauricio-Morales asserts that the framework set forth in *Arlington Heights* governs review of § 1326.  (Doc. 18.)  Yet, he fails to address why *Arlington Heights*, and not rational basis review, should apply in this context.

The Tenth Circuit has explicitly stated that, "[w]hen Congress exercises [its] power[] to legislate with regard to aliens, the proper standard of judicial review is rational-basis review."  *Soskin v. Reinertson*, 353 F.3d 1242, 1255 (10th Cir. 2004).  "The federal government can treat aliens differently from citizens so long as the difference in treatment has a rational basis."  *Id.* at 1254 (citing *Mathews v. Diaz*, 426 U.S. 67, 78–83 (1976)).

Additionally, five of our sister circuits have applied rational basis review when confronted with equal protection challenges to federal immigration legislation.  *See, e.g.*, *Hernandez-Mancilla v. Holder*, 633 F.3d 1182, 1185 (9th Cir. 2011); *De Leon-Reynoso v. Ashcroft*, 293 F.3d 633, 638 (3d Cir. 2002); *Moore v. Ashcroft*, 251 F.3d 919, 921 (11th Cir. 2001); *Lara-Ruiz v. INS*, 241 F.3d 934, 947 (7th Cir. 2001); *Rojas-Rojas v. INS*, 235 F.3d 115, 122 (2d Cir. 2000).  So, too, have district courts—within this district as well as across the country—applied rational basis review to such challenges; moreover, they have done so when analyzing the specific challenge that Mr. Mauricio-Morales brings in this case.  *See, e.g.*, *United States v. Amador-Bonilla*, No. CR-21-187-C, 2021 WL 5349103, at *1 (W.D. Okla. Nov. 16, 2021); *United States v. Novondo-Ceballos*, No. CR-21-383-RB, 2021 WL 3570229, at *3 (D.N.M. Aug. 12, 2021); *United States v. Gutierrez-Barba*, No. CR-19-1224-PHX-DJH, 2021 WL 2138801, at *2, *5 (D. Ariz. May 25, 2021); *United States v. Palacios-Arias*, No. 3:20-cr-62-JAG (E.D. Va. Oct. 13, 2020), *appeal pending*, No. 21-4020 (4th Cir.).  *But see, e.g.*, *United States v. Carrillo-Lopez*, __ F. Supp. 3d __,

2021 WL 3667330, at *2–3 (D. Nev. Aug. 18, 2021); *United States. v. Machic-Xiap*, __ F. Supp. 3d __, 2021 WL 3362738, at *9–10 (D. Or. Aug. 3, 2021); *United States v. Wence*, No. 3:20-cr-27, 2021 WL 2463567, at *2–4 (D.V.I. June 16, 2021); *United States v. Rios-Montano*, No. 19-CR-2123-GPC, 2020 WL 7226441, at *1–2 (S.D. Cal. Dec. 8, 2020).

Canvassing countervailing authorities, one rationale for rejecting rational basis review relies on an alien defendant's presence in the United States and concludes that, accordingly, such a defendant is entitled to Fifth Amendment protections. *See, e.g.*, *Machic-Xiap*, 2021 WL 3362738, at *9 (citing *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001)). However, this reasoning misses the mark. Whether an alien defendant is entitled to constitutional protections in a criminal proceeding is a separate issue from what standard of review applies to a constitutional challenge to an immigration law. Indeed, the United States agrees that any such defendant is protected by the Fifth Amendment's guarantees. *See Wong Wing v. United States*, 163 U.S. 228, 237 (1896) (demonstrating that criminal prosecutions of immigration offenses are subject to constitutional limitations). The instant issue is the level of scrutiny required in assessing an alien defendant's constitutional challenge. That standard is rational basis review.[1]   *See Amador-Bonilla*, 2021 WL 5349103, at *1 (finding that "the rational basis standard is the appropriate level of review").

---

[1] Courts have also relied on *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020) (plurality opinion), as a basis for rejecting rational basis review. *See, e.g.*, *Carrillo-Lopez*, 2021 WL 3667330, at *2. However, contrary to the *Carrillo-Lopez* court's statement that "a plurality of the United States Supreme Court declined to adopt the standard advanced by the government in race-based equal protection challenges of immigration decisions by the executive, . . . instead appl[ying] *Arlington Heights*," *id.*, the Supreme Court assumed, without deciding, that *Arlington Heights* applied, *Regents of the Univ. of Cal.*, 140 S. Ct. at 1915. Accordingly, the Court's holding did not encompass the appropriate standard of review.

4

Rational basis review is deferential toward governmental action. *Seegmiller v. LaVerkin City*, 528 F.3d 762, 772 (10th Cir. 2008). "A statute is presumed constitutional, and 'the burden is on the one attacking the legislative arrangement to negative every conceivable basis which might support it.'" *Heller v. Doe*, 509 U.S. 312, 320–21 (1993) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)) (cleaned up); *see Seegmiller*, 528 F.3d at 772 ("The burden is on the plaintiff to show the governmental act complained of does not further a legitimate state purpose by rational means." (citing *Powers v. Harris*, 379 F.3d 1208, 1215 (10th Cir. 2004))). An equal protection claim will not survive rational basis review if there is "any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 314 (1993) (collecting cases).

Applying rational basis review, Mr. Mauricio-Morales's motion must fail. The Tenth Circuit has recognized the legitimate government interest underlying § 1326's enactment. *United States v. Gutierrez-Gonzalez*, 184 F.3d 1160, 1165 (10th Cir. 1999) ("Congress has been faced with the increasingly difficult task of stemming the flood of illegal immigration to this country."). Section 1326 "is a regulatory statute enacted to assist in the control of unlawful immigration by aliens." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998) (quoting *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968), *abrogated on other grounds by United States v. Gracidas-Ulibarry*, 231 F.3d 1188, 1190 (9th Cir. 2000) (en banc)).

> The [United States] has an interest in ensuring compliance with deportation orders and promoting respect for the country's legal immigration process. This interest is achieved by deterring illegal reentry into the United States.

[It is] axiomatic that § 1326 rationally relates to that interest by sanctioning those who disregard a previous deportation order.

*Novondo-Ceballos*, 2021 WL 3570229, at *4; *see id.* (collecting cases).  Because § 1326 is rationally related to a legitimate government interest, and Mr. Mauricio-Morales cannot—and has not—shown otherwise, this Court should deny his motion to dismiss.

## II.   Even if the *Arlington Heights* Framework Applied to Mr. Mauricio-Morales's Challenge, his Motion to Dismiss Should be Denied.

Applying *Arlington Heights*, Mr. Mauricio-Morales has the burden of demonstrating: 1) disparate impact; and 2) that "a discriminatory purpose [was] a motivating factor in the decision." 429 U.S. at 265–66.  If Mr. Mauricio-Morales can make this showing, then the burden shifts to the United States to "establish[] that the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21.  Not only would Congress have enacted § 1326 without the discriminatory purpose alleged, but Mr. Mauricio-Morales also fails to establish that Congress was motivated by such a factor.  Accordingly, Mr. Mauricio-Morales's motion should be denied.

### a.  Mr. Mauricio-Morales Fails to Carry his Burden Under *Arlington Heights*.

As Mr. Mauricio-Morales contends, § 1326 likely disparately impacts Latinos more than any other group.[2]  (Doc. 18.)  However, this impact on Latinos "is more readily

---

[2] Mr. Mauricio-Morales does not clearly address disparate impact; rather, he devotes one sentence to this point.  (*See* Doc. 18 ("The 1952 Congress had full knowledge of the unlawful reentry statute's disparate impact, as Mexicans comprised up to 99% of the tens of thousands of individuals prosecuted and convicted in the years following the law's passage.").)  Otherwise, he appears to rely on the exhibits attached to his motion to speak to this issue.

explained by the geographic proximity of the border to Mexico and Latin America than by racial animus." *United States v. Morales-Roblero*, No. 3:19-mj-24442-AHG, 2020 WL 5517594, at *10 (S.D. Cal. Sept. 14, 2020) (analyzing § 1325). Furthermore, "official action [is] not held unconstitutional solely because it results in a racially disproportionate impact." *Arlington Heights*, 429 U.S. at 264–65 (citing *Washington v. Davis*, 426 U.S. 229, 239 (1976)). "Were this [] sufficient to state a claim, virtually any generally applicable immigration policy could be challenged on equal protection grounds." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1916 (2020); *see id.* ("[B]ecause Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration relief program."). Thus, "the intent test requires additional evidence of an invidious motive before finding [a] law unconstitutional[,]" *Wence*, 2021 WL 2463567, at *10, especially given that immigration policies are often "plausibly explained on a neutral ground," *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 275 (1979).

In determining whether discriminatory intent was a motivating factor in governmental action, courts look to (1) "[t]he historical background of the decision," (2) "[t]he specific sequence of events leading up to the challenged decision," (3) "[d]epartures from the normal procedural sequence" or "[s]ubstantive departures" from "the factors usually considered important by the decisionmaker," (4) whether the effect of the action "bears more heavily on one race than another," and (5) the legislative history of the statute. *Id.* at 266–68. Although Mr. Mauricio-Morales makes much of the Undesirable Aliens Act of 1929, Pub. L. 70-1018, 45 Stat. 1551 (1929), the appropriate decision for review is the

Immigration and Nationality Act of 1952 ("INA"), Pub. L. 82-414, § 276, 66 Stat. 163, 229 (1952).[3]

"The historical background of the decision is one evidentiary source" of intent. *Arlington Heights*, 429 U.S. at 267 (collecting cases).  But, "unless historical evidence is reasonably contemporaneous with the challenged [action], it has little probative value." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987).

In his motion to dismiss, Mr. Mauricio-Morales describes at length the historical background of legislation enacted in the 1920s that served as precursors to § 1326's unlawful reentry provision.  (Doc. 18.)  He cites portions of the legislation and comments made on the floor of Congress, alleging that each reflects a palpable aversion to Mexican immigration to the United States.  (*Id.*)  However, his focus on the history of these Acts undermines his argument.  Accepting *arguendo* his contentions that these precursors were tainted with racial discrimination, Congress repealed these prior Acts when it enacted the INA.  *See* INA, § 403(a)(23), (30), 66 Stat. at 279.  Thus, this aspect of the INA's historical background suggests that Congress repudiated the very attitudes that Mr. Mauricio-Morales contends underlie the INA.

---

[3] Judge Cauthron addressed this point unequivocally when confronted by an identical motion to Mr. Mauricio-Morales's motion:

> The primary flaw in Defendant's argument is his focus on the 1929 Act.  As [the United States] notes, the first step in applying *Arlington Heights* is to identify what decision maker and decision is being reviewed.  When that analysis is undertaken[,] it is clear that [the United States] is correct in noting that the Court's review should focus on the [INA].

*Amador-Bonilla*, 2021 WL 5349103, at *2.

Furthermore, an analysis of this legislation from the 1920s does not suggest that Congress acted with a discriminatory purpose toward Latinos in passing this legislation. For example, the 1924 Act treated immigrants from Mexico and independent countries in Central and South America more favorably than those coming from other countries because it did not limit the number of persons from Mexico, Central America, or South America who could enter the United States. *See* Act of May 26, 1924, 68 Cong. Ch. 190, § 4(c), 43 Stat. 153, 155. Additionally, the 1929 Act, which incorporated a memorandum from the Labor Department and a letter from the Secretary of Labor, *see* Act of March 4, 1929, 70 Cong. Ch. 690, 45 Stat. 1551, expressed concern with aliens who had been "deported four or five times, only to return as soon as possible to the United States in an unlawful manner." (Doc. 18.) The letter then explained that a significant number of "the aliens who [were] required to be deported enter as seamen," which suggests that those aliens were not entering through Mexico or Canada—and does not indicate these aliens were Latinos. (Doc. 18.) In any event, as mentioned *supra*, the probative value of the historical background of this legislation, including the accompanying record, is limited because it is remote in time to the INA. *McCleskey*, 481 U.S. at 298 n.20.

Mr. Mauricio-Morales also cites the Act of March 20, 1952, 82 Cong. Ch. 108, 66 Stat. 26. As Mr. Mauricio-Morales argues, debate surrounding the 1952 Act often involved the use of the term, "wetback." (*See, e.g.*, Ex. 1 [98 Cong. Rec. 791–93].) The term itself is undeniably degrading, *see Vigil v. City of Las Cruces*, 119 F.3d 871, 874 (10th Cir. 1997) (Lucero, J., dissenting from denial of rehearing en banc), but it refers to illegal immigrants from Mexico—not to Latinos who were in the United States lawfully, *see, e.g., United*

*States v. Alamosa Cnty.*, 306 F. Supp. 2d 1016, 1020 n.11 (D. Colo. 2004) ("[T]he term 'wetback' refers to illegal Mexican immigrants rather than to local Hispanic residents.").[4]

This distinction is further evinced by Senator Dennis Chavez's use of the term. Senator Chavez was the first Hispanic person elected to the United States Senate for a full term.  (Ex. 2 at 1.)  "[A] strong defender of civil rights," Senator Chavez was known for "not [being] afraid to bring the 'race' issue into elections and politics."  (Ex. 3 at 2.)  Thus, it stands to reason that Senator Chavez would not have used the term himself if it were a derogatory term for Latinos.  As a result, these uses of the term "wetback" do not support a finding that the historical background reflects a discriminatory purpose toward Latinos, despite the term's unsavory connotations, because the term did not encompass Latinos who were lawful residents.[5]  *See Soskin*, 353 F.3d at 1254 ("The federal government can treat aliens differently from citizens so long as the difference in treatment has a rational basis.").

Additionally, the 1952 Act begins with the Agreement Between the United States of America and Mexico Representing the Temporary Migration of Mexican Agricultural Workers, 56 Stat. 1759, 1942 WL 35711 (Aug. 4, 1942), which was designed to "ensur[e] decent wages and humane treatment for the laborers."  (Doc. 18.)  Although he cites the

---

[4] President Truman's Special Message to the Congress on the Employment of Agricultural Workers from Mexico appeared to recognize this definition of "wetback" as well.  (Ex. 4 at 2.)

[5] Furthermore, the statements made during floor debates should be given minimal weight.  Mr. Mauricio-Morales essentially asks this Court to take statements by a handful of representatives and to impute their views on Congress as the reasons that these immigration laws were enacted. But, it has long been established that courts should decline to void a statute, which is constitutional on its face, solely on the basis of several Congressmen's statements. *United States v. O'Brien*, 391 U.S. 367, 384 (1968); *id.* ("What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.").

Agreement in his motion, Mr. Mauricio-Morales overlooks the substance of the agreement between the United States and Mexico, focusing instead on how it was carried out; but, he focuses on the wrong inquiry.  The relevant issue is the substance of Congress' intent in enacting the legislation—the failure of another party to carry out Congress' goals to treat Mexican immigrants well does not bear on Congress' intent.  Thus, contrary to Mr. Mauricio-Morales's contention, the historical background of the INA does not clearly demonstrate that Congress was motivated by a discriminatory purpose toward Latinos when it enacted the INA.

In the years preceding the enactment of the INA, the Senate Judiciary Committee authorized a subcommittee to complete an investigation of the United States' immigration system. (Ex. 6 at 2.)  That subcommittee reported that the United States' immigration laws needed to be consolidated and replaced by a single bill, and its report highlighted concerns about any racial discrimination that had been involved in previous immigration laws.  (*Id.*)

The report was unequivocal in its findings, indicating a significant desire for racial equality and an inertia toward the removal of pre-existing racial barriers.  (*See* Ex. 6 at 12 ("The evidence and testimony presented to the subcommittee are overwhelmingly in favor of the removal of racial bars to naturalization."); *id.* ("The arguments which obtain for lifting racial bars to immigration apply with equal force to naturalization."); *id.* ("Removal of racial barriers to immigration and naturalization has much to recommend it from the standpoint of improved international relations and prestige.").)  The subcommittee's report further noted that "[these] actions would greatly strengthen international good will by

11

demonstrating that we practice what we preach in the matter of equality of individuals and races." (*Id.*)

These concerns are directly reflected in the INA. *See, e.g.*, INA, § 311, 66 Stat. at 239 ("The right of a person to become a naturalized citizen of the United States shall not be denied or abridged because of race[.]"). Thus, the events leading up to the enactment of the INA show that Congress was concerned with ending racial discrimination, rather than fostering it.

The legislative history of the INA further suggests that Congress sought to end racial discrimination in passing the Act, despite the controversy that arose in the process of passing the Act. When the INA arrived on President Truman's desk, he vetoed the bill because, although it removed the total bar on immigration from Asian countries, it maintained a national origin quota system for Asian countries. *Id.* § 201(a), 66 Stat. at 239. This is widely speculated to be what prompted President Truman to claim that the "legislation . . . would perpetuate injustices of long standing." (Doc. 18.)

But, there is plenty of evidence to suggest that Congress overrode President Truman's veto in an attempt to remove racial barriers to immigration. Although several senators made racially inappropriate statements during the debate immediately preceding the veto, *see Wence*, 2021 WL 2463567, at *7 (citing 82 Cong. Rec. 8116 (June 26, 1952)), other congressmen highlighted "many good and desirable provisions of the bill," *id.* (citing 82 Cong. Rec. 8215 (June 26, 1952)). *See* 82 Cong. Rec. 8218 (June 26, 1952) (submitting that President Truman's veto kept statutes as they were, "with hundreds of millions of people . . . still outlawed because of the color or the pigment of their skin"). And, just as

the report issued by the subcommittee for the Senate Judiciary Committee reflected a desire to set an example on the international stage, members of Congress similarly wanted to "make clear . . . that the representatives of the people of the United States believe in trying to correct things that are inequitable [and in] improv[ing] relations between [the United States] and all the peoples in the world who want to be free[.]" 82 Cong. Rec. 8218 (June 26, 1952).

Therefore, the legislative history of the INA does not favor a finding that Congress was motivated by a discriminatory purpose. Although the INA did "not remove all the inequities in existing law, . . . it [did] remove a great many[.]" 82 Cong. Rec. 8347 (June 27, 1952); *see Wence*, 2021 WL 2463567, at *9 ("[A] review of the legislative history reveals a balancing of valid immigration considerations such as providing support for Latinx immigrants displaced by violence while protecting the health and safety of the nation.").

Finally, nothing about the procedural process of enacting § 1326—from the subcommittee report to the veto and its subsequent override—indicates that Congress was motivated by a discriminatory purpose. As discussed *supra*, "the INA followed a comprehensive review of the entire panoply of the nation's immigration laws. Congress passed the INA after study by committee and significant debate." *Machic-Xiap*, 2021 WL 3362738, at *14. Furthermore, Mr. Mauricio-Morales fails to identify any deviations Congress made from procedural norms when it enacted § 1326. Thus, this factor also weighs against a determination that a discriminatory purpose was a motivating factor in enacting § 1326. As Mr. Mauricio-Morales has not shown that the historical background

13

of the INA, its legislative and procedural history, or the events leading up to its enactment evince that Congress was motivated by a discriminatory purpose, he fails to satisfy his burden under the *Arlington Heights* framework.   Accordingly, his motion should be denied.[6]

### b.   Even if Mr. Mauricio-Morales Could Satisfy his Burden Under *Arlington Heights*, the Evidence Shows That Congress Would Have Enacted § 1326 Without a Discriminatory Motivation.

If Mr. Mauricio-Morales could demonstrate that Congress was motivated by a discriminatory purpose in enacting § 1326, the United States would have to "establish that the same decision would have resulted even had the impermissible purpose not been considered."  *Arlington Heights*, 429 U.S. at 270 n.21; *see id.* ("Motivat[ion] in part by a racially discriminatory purpose [does] not necessarily . . . require[] invalidation of the challenged decision.").  The United States can do so.

A survey of Congressional action demonstrates that Congress would have enacted § 1326 without a discriminatory purpose.   To begin with, Congress enacted the Immigration and Nationality Act of 1965, Pub. L. 89-236, 79 Stat. 911 (1965), in response to the Commission on Immigration and Naturalization established by President Truman following passage of the INA.   (*See* Ex. 5.)   The 1965 Act explicitly precluded discrimination based on race in the issuance of immigrant visas, *see id.* § 2, 79 Stat. at 911,

---

[6] Under the *Arlington Heights* framework, "the impact of the [enactment of § 1326] and whether it bears more heavily on one race than another" appears to be both a factor to consider in determining whether Congress was motivated by a discriminatory purpose, as well as the crux of the disparate impact inquiry, which is a distinct and antecedent question to whether Congress was motivated by a discriminatory intent.  In any event, the United States addresses § 1326's impact at the outset of the analysis of Mr. Mauricio-Morales's claim under the *Arlington Heights* framework.

and abolished the national origin quota system, *see id.* § 1, 79 Stat at 911, the latter of which had been a component of the INA.  Yet, in doing so, Congress did not repeal § 1326. This suggests that Congress believed § 1326 was necessary and appropriate despite any possibility that racial discrimination was a motivating factor behind the INA.

In addition, Congress enacted the Immigration Reform and Control Act of 1986 ("IRCA"), Pub. L. 99-603, 100 Stat. 3359 (1986), in an attempt to bolster criminal penalties for those who transport aliens across the border illegally and for businesses that make a pattern or practice of hiring illegal aliens.  *See id.* § 101(f), 100 Stat. at 3367–68; *id.* § 112(a), 100 Stat. at 3382.  These penalties reinforced existing immigration laws, such as § 1326, rather than loosening restrictions on illegal immigration.  By supplementing these laws, Congress expressed acceptance of § 1326 and the other immigration statutes then in effect.  *See id.* § 115, 100 Stat. at 3384 ("[T]he immigration laws of the United States should be enforced vigorously and uniformly.").

Furthermore, the IRCA was enacted without a discriminatory purpose.  It provided a pathway for illegal aliens to legalize their statuses, *see id.* § 201, 100 Stat. at 3394–3404, and expressly prohibited discrimination based on race, *see id.* §§ 121(b)(6), 204(h), 100 Stat. at 3391, 3409–10.  Moreover, many illegal aliens, "an estimated 3 million individuals—mostly of Hispanic descent," utilized this avenue to obtain legal status in the United States, which demonstrates that the IRCA's guarantees were not merely Congressional lip service.  (*See* Ex. 7 at 2.)  Thus, the reaffirmation of § 1326 that Congress expressed when it enacted the IRCA was not grounded in a discriminatory purpose either.

15

Finally, Congress has considered and modified § 1326 itself, rather than repealing it. *See* Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, §§ 401(c), 438(b), 441(a), 110 Stat. 1214 (1996); Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, Div. C. §§ 305(b), 308(d)(4)(J), 308(e)(1)(K), 308(e)(14), 324(a), 110 Stat. 3009 (1996); Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 130001(b), 108 Stat. 1796 (1994); Immigration Act of 1990, Pub. L. 101-649, § 543(b)(3), 104 Stat. 4978 (1990); Anti-Drug Abuse Act of 1988, Pub. L. 100-690, § 7345, 102 Stat. 4181 (1988).   This plainly demonstrates that Congress would have enacted § 1326 without a discriminatory purpose, given that Congress has had many opportunities to remove § 1326 from the books and has chosen—time and time again—to retain it.[7]   Accordingly, even if this Court finds that the *Arlington Heights* framework applies and that Mr. Mauricio-Morales has shown that § 1326 was enacted with a discriminatory purpose, this Court should deny the motion because Congress would have enacted § 1326 even without a discriminatory purpose.[8]

---

[7] Public polls also suggest that Congress would enact § 1326 today without any discriminatory motivation.  (*See* Ex. 9 (examining a poll conduct by Marist College and commissioned by National Public Radio and PBS NewsHour, which reflected that 66% of adults believed it would be a bad idea to decriminalize illegal border crossings and 27% of adults believed it would be a good idea to decriminalize illegal border crossings).)

[8] It also bears mentioning that the criminalization of unlawful entry or reentry to a nation is a standard practice for many countries across the world.  As of August 2019, at least 124 countries treated illegal entry as a crime.  (*See* Ex. 8 at 3 (including France, Germany, Italy, Japan, the United Kingdom, Canada, Russia, China, India, Honduras, Chile, and Haiti).)  This further supports the notion that the United States would have adopted § 1326 free of any alleged racial motivation, as many countries have concluded that it is prudent to criminalize unauthorized entry and/or reentry without any indications that racial discrimination against Latinos played a factor in those decisions.

## CONCLUSION

The criminal enforcement of illegal reentry to the United States, pursuant to § 1326, is rationally related to the government's legitimate interest in maintaining respect for our immigration process and controlling unlawful immigration.  This Court should deny Mr. Mauricio-Morales's motion to dismiss the indictment on this basis alone.  However, even if this Court applies the *Arlington Heights* framework, Mr. Mauricio-Morales fails to demonstrate that racial discrimination was a motivating purpose in enacting § 1326, and the United States has shown that Congress would have still enacted § 1326 without any such discriminatory purpose.  Accordingly, Mr. Mauricio-Morales's motion should be denied.

Respectfully submitted,

ROBERT J. TROESTER
United States Attorney

*s\Elizabeth Joynes*
Assistant United States Attorney
Virginia Bar No. 94827
210 Park Avenue, Suite 400
Oklahoma City, OK 73102
(405) 553-8849 (Office)
(405) 553-8888 (Fax)
elizabeth.joynes@usdoj.gov

17

### CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2021, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:  Julia Summers, counsel for Luis Carlos Mauricio-Morales.

_s/Elizabeth Joynes_____
Assistant United States Attorney

18